The case for argument is 17-1149, In Re Thomas. Mr. Thomas, whenever you're ready. May it please the court. The invention at issue is all about thermal and power management of computers. This is an appeal from the patent office, and one complaint we have concerns a few dependent claims, 7 and 19. These claims deal with controlling the speed or performance of a microprocessor, and they do so with some specific claim limitations. And those are namely, the retrieval of clock control data dependent upon the operational mode. Then once you have that, you compare that with a temperature measurement, which we'll talk about later. And from that comparison, you're going to generate the clock speed data. And then that clock speed data is delivered to the microprocessor and controlled. Where's the error in what the board did? The error is that the board's consideration in their decision, they have but a single sentence. And that single sentence makes reference to one reference, Akita. And the board basically stated that it agreed with the examiner, whose consideration of these claims was also extremely weak and limited. And basically the agreement that the board and the examiner had between themselves was that this Akita reference teaches high and low clock speeds, which are based upon the temperature of the microprocessor. And from that, they alleged that such high and low clock speeds correspond to a normal mode and a power system. So basically they used Akita as disclosing the use of temperature to determine the clock speed. So there is really no consideration of what I recited a minute ago about retrieval of a clock control data based upon a mode. To the extent they made any analysis, they reached some sort of conclusion that there was modes. They didn't go to the next level, which the claim requires that you have to retrieve clock control data dependent upon the mode. And then you make the comparison using that retrieved data with the temperature. So it's our opinion that there's no evidence as to the retrieval of the clock control data based upon a mode. And then there can be no comparing against that clock control data. And the reference itself, Akita, what it teaches is that they compare a temperature measurement with a predetermined set threshold. And that's illustrated in the reference. And because it has a set temperature, it can't be dependent upon a mode. It's fixed, and the point of these claims 7 and 19 is it's not fixed. It's dependent upon the mode, and that's why we retrieve the clock control data based upon the mode. So from that analysis, it's our opinion that the reason the basis or explanation by the agency is inadequate and requires reversal. And this is focused on the limitation in claim 7 for retrieving clock control data, right? Primarily that, and then the subsequent operation of comparing that against temperature. So moving to claim 4, the sole independent claim, a disputed limitation concerns a temperature measurement. And in our claims, we're talking about obtaining this temperature measurement from a temperature sensor that is internal to a microprocessor. And then we also recite that that same temperature measurement is made available external to the microprocessor, so that we can make these comparisons like the one we just talked about. In claim 4, the comparison has to do with fan control as opposed to clock control in claim 7. But the temperature measurement in both cases is the same. So the gist of the limitation is we have a sensor inside the chip, get the actual temperature measurement, and then we make that available outside the chip. None of the references do that. The primary reference the office PTO director relies on is PIPIN. And in that reference, it does have an internal temperature sensor. But that temperature measurement that PIPIN offers is not available outside the microprocessor, intentionally so. The parties basically agree that PIPIN does have temperature measurement. And it's from the voltage bandgap circuit 110 that you can see in figure 1 of PIPIN. That's an internal temperature sensor. But PIPIN processes that temperature measurement inside so that it can generate what's called the interrupt signal. And then it uses this interrupt signal inside to interrupt processing operations. So you'll note that the interrupt signal is sent to what they refer to as processor unit 705 and a microprogram 740. So conventionally an interrupt is to alter the processing going on. So that's what it's doing. But figure 9 in PIPIN does show that this interrupt signal is made available external to the chip. So remember, our temperature measurement has to go external to the chip. So what PIPIN has going external is this thing called the interrupt signal. The office is trying to distort PIPIN so that you believe them that this interrupt signal is also a temperature measurement. And the board agreed with the examiner's statement that it's not quite clear if they actually called it a temperature measurement. But they said they considered it as a temperature measurement because it suggested that the signal is indicative of a temperature. The interrupt signal is just a digital 0 or a 1. There's no measurement ability with that. But it still indicates whether the temperature has exceeded a certain threshold, right? It indicates that at some point in time the temperature sensor had a temperature that was elevated. I think they used 100 degrees or something in their example. At some point it tripped and the signal went. But that's it. The signal that went is what we're talking about. That's the only thing that's available outside. Outside you know you've got a signal, but you don't know what these temperatures go to. You can go from 0 to 100 or 150 in less than a second if you go from 100 to 150. You don't really know what the temperature is outside. And beyond that, outside you just have the little signal that it triggered. How are you going to compare that to clock control data or fan control data? You can't. The specific question is can BRI be used to distort the teachings of PIPIN such that that interrupt signal is considered a temperature measurement? We think that that is an extreme position given that PIPIN does, and both parties agree, have a temperature measurement. And it's not the interrupt signal. It's the output of the voltage bandgap circuit, 110. The only reason they're looking to find another temperature measurement is because the reference doesn't really teach it. And the interrupt signal can't be used to make the comparisons. And, for example, the temperature measurement we're using externally with respect to Claim 4 is to compare with mode-dependent fan control data. They also don't have this mode-dependent fan control data. Similarly, like in Claim 7, they didn't have the mode-dependent clock control data. They also have a backup position with the reference Akita again. And it's not clear how they're combining these two references or what the motivation is to do so. But in any case, the Akita reference is not an internal temperature sensor. It's external to the microprocessor. It does make a comparison external to the microprocessor. But its comparison is with a fixed threshold temperature. And you can see that on the front page of Akita. It's a little signal, TS. That is, again, a fixed value. It cannot be mode-dependent. There's no ability to change it. May it please the Court, I only have two points to make on the program. One, the fact that Pippin's temperature sensor is programmable, that in itself defines the fact that it is measuring a specific temperature at a specific threshold. And so there's no doubt that the sensor of Pippin is making a temperature measurement within the processor. And the fact that that temperature measurement is then further processed to generate an interrupt signal, which is then received by circuitry external to the microprocessor, does not mean that that interrupt signal no longer represents a temperature measurement. And that has always been the Office's position, and Mr. Thomas hasn't provided any reason to doubt why temperature measurement should be understood in any other way. The only other argument that Mr. Thomas raised that I would like to address is with regards to Claims 7 and 19, specifically the clock control data. And that argument, from the Board's perspective, is the same argument with regards to the fan control data, which is simply met by these various predetermined, preprogrammed temperature thresholds that are part of the sensor. And once that temperature threshold is reached, that is your fan control data, that is your clock control data, which is then used, depending on the mode of the system, to decide how to control the fan or how to control the clock speed. It's as simple as that. There's nothing here that distinguishes Mr. Thomas' claims from Pippin's claims. I understood the appellant to be arguing with regard to Claim 7, the absence of retrieving clock control data. Is that what you understood him to be arguing on Claim 7? I believe that is what he is arguing, this retrieval of clock control data. Isn't shown in the prior article? No, I believe it is. It is shown in the prior article. Does this also depend on the external-internal debate? I don't believe so, no. So did you understand this argument that he is making on Claim 7? I did not certainly understand that from his briefs. I thought the challenge on Claim 7 was essentially the internal-external. Did you understand his argument this morning to be a new argument? I just need a little help. His argument with regard to Claim 7 based on the absence of retrieving clock control data in the prior article, maybe I'm not smart enough to figure this out, but that sounded new to me. The majority of Mr. Thomas' brief has focused on this internal-external temperature measurement. What's interesting is that with regards to Claim 4, he's never argued about fan control data, and today he's made this argument about clock control data, but the board's analysis as to both is the same. Those are just two ways of controlling heat dissipation in the system, and they're both controlled in similar ways. There are no further questions. Thank you. One point that I'd like to make is that our comparisons are all made external to the microprocessor, and that's clear from the claims. Fan control data, which I did reference with respect to Claim 4, was not the linchpin argument in our brief. It is casually mentioned, but it is actually more presented in the director's brief. I want to touch on the motivation to combine. The board and the examiner justified the combination with the general allegation of cost reduction, and it's troubling if you were to accept such a rationale. That's not a legitimate theory for combination? Many times the examiner will just fabricate something. No, I don't think it's legitimate. In the context of this case, no. With all the relevant prior art in front of it, wouldn't the motivation to achieve efficiency and cost or whatnot be something that might be motivating for your artists in their attempt to solve a problem? The director believes that because PIPN has an internal temperature sensor, then it manipulates it into an interrupt inside. They want to break that device apart and say that the Akita reference would motivate breaking that apart and pulling one part and putting it on the outside so that they have the needed temperature measurement outside. They speculate that, oh, okay, I pull off that comparator circuit, which just is implemented by a handful of transistors. I pull that out and put it outside, and that will save money. In the event that I have to replace the microprocessor, they'll pay less. But a microprocessor has in excess of a million transistors, and saving four or five for this reason makes no sense. It's hard to conceive how that one skill in the art would be motivated to break apart something, to save five transistors, to somehow save on a replacement cost. Did you present evidence to that effect? We presented basic argument. In the patent office, you tend not to have an expert report or some other outside evidence. As a general proposition, would you agree that saving money is a motivating factor for an ordinary artisan? Even if that is an acceptable motivation for purposes of argument, it didn't work in this case because you didn't save enough money. I think the ordinary artisan is a technical thinking person, and they're not really worried about trying to get the best product. They're not trying to figure out how much it costs. That's something that happens after an innovation and trying to make it market ready. Thank you.